MURPHY ET AL., RESPONDENTS, *v.* COOPER, APPELLANT.

(No. 2,803.)

(Submitted March 18, 1910. Decided April 2, 1910. )

[108 Pac. 576.]

*Logs and Logging—Action on Contract—Insufficiency of Evidence—Appeal.*

Appeal—Conflicting Evidence—Verdict—Conclusiveness.
    1.   Where, in an action at law, the testimony is conflicting in substantial particulars, the verdict of the jury will not be disturbed on appeal under an assignment that the evidence is insufficient to justify it.

Logs and Logging—Action on Contract—Insufficiency of Evidence.
    2.   Evidence adduced in an action to recover for services rendered in cutting timber, *held* to show that plaintiffs, who had been directed to confine their operations to timber standing upon defendant's lands, had trespassed on the public domain, for which unlawful cutting the defendant had paid damages as alleged in his counterclaim, and to be insufficient to justify a verdict in their favor.

Appeal—Rehearing—Questions not Reviewable.
    3.   The sufficiency of a counterclaim may not be called in question for the first time on motion for a rehearing in the appellate court.

*Appeal from District Court, Gallatin County; W. R. C. Stewart, Judge.*

ACTION by J. T. Murphy and another, copartners, doing business under the firm name and style of Murphy & Ryan, against Walter Cooper. From a judgment for plaintiffs and an order overruling his motion for a new trial, defendant appeals. Reversed and remanded.

*Mr. George Y. Patten* submitted a brief and argued the cause orally in behalf of Appellant.

In behalf of Respondents, there was a brief and oral argument by *Mr. George D. Pease.*

MR. JUSTICE SMITH delivered the opinion of the court.

This is an appeal from a judgment in favor of the plaintiffs and from an order of the district court of Gallatin county, overruling the defendant's motion for a new trial.

The action was brought to recover the sum of $2,235.40 as a balance alleged to be due on an account for work, labor and services performed by plaintiffs in cutting, hauling and delivering railroad ties and other timber, in Bear Canyon, Gallatin county, for the defendant between November 1, 1905, and August 1, 1908. The answer admits the allegations of the complaint and that the amount claimed by the plaintiffs is due them; but it is asserted that the sum of $1,872.30 should be deducted therefrom by way of counterclaim. For such counterclaim defendant alleges that on or about September 24, 1906, the parties entered into an oral contract, by the terms of which plaintiffs were to cut for him all the railroad ties which could be made from the timber on certain lands belonging to him in sections 16, 17, 20 and 28, township 3 south, range 7 east, Bear Canyon, in Gallatin county, for which he was to pay them thirty cents for No. 1 ties, eighteen cents for No. 2 ties, and six and one-half cents per stick for lath timber, to be made from the tops of the tie timber; that pursuant thereto plaintiffs cut a

large quantity of timber between September 24, 1906, and April 1, 1908, and, while so engaged, the plaintiffs willfully and negligently, in the course of such cutting, entered upon certain lands belonging to the United States, in sections 8, 9, 17, 21 and 28, in the same township and range, and there cut, in trespass, certain timber, for which the defendant was compelled to, and did, pay to the federal government the sum of $1,250.10; that they left upon the ground certain brush, slashings, and refuse; that the defendant has been compelled to give to the government of the United States a bond in the sum of $300, as a guaranty that he will clear up such brush, slashings and refuse; that the same will cost him about $120.20; that, further, by reason of said trespass he was required to and did expend the sum of $500 for surveys in re-establishing his lines, and in settling such trespass. He further alleges that he notified the plaintiffs of the claims made by the officers of the United States on account of such trespass, and of the fact that he would be compelled to pay the same, and that he would charge the amounts thereof to them and deduct them from the sum due them under the contract, to which they assented. In their replication plaintiffs admit that they entered into the contract, but they allege that according to its terms the ties and timber were to be cut by them on lands designated by defendant; that no particular lands were designated by him at the time the agreement was entered into, but it was understood and agreed that the defendant was to survey and designate on the ground the lands from which the timber was to be cut, from time to time, as plaintiffs were ready to cut the same. They deny that they cut any timber from government lands, but allege that, if they did so, it was on account of the fact that such timber was designated by defendant. They deny any knowledge or information sufficient to form a belief as to whether the defendant has been compelled to pay any moneys to the United States government, and they deny positively that they ever assented to any settlement between defendant and the United States, or that any amount should be charged to them. The cause was tried to the

court sitting with a jury.  A general verdict was returned in favor of the plaintiffs for the full amount claimed by them, upon which verdict judgment was entered.

It is contended (1) that the court erred in admitting and rejecting certain testimony; and (2) that the evidence is insufficient to justify the verdict.  There are thirty-five specifications and assignments of error found in appellant's brief, but they have all been grouped under the two general contentions noted above.  We shall first consider the second assignment, and will remark, in passing, that this was peculiarly a case wherein special findings would have greatly simplified the work of the district court, as well as of this court, and would have removed a certain element of uncertainty which has occasioned some embarrassment and much extra research and consideration of the testimony found in the record.

Walter Cooper testified that the contract was made in his private office between himself and Murphy; that in the course of the conversation Murphy said that he was perfectly familiar with the lines of defendant's lands; that they had a blue-print and a compass; that Murphy was told they must adhere to the lines of defendant's land, because the price was such that he could not afford to pay a man to direct them, whereupon Murphy said that they were old tie-makers, and as such were familiar with the compass and with running lines, and were perfectly able to look after that part of it; that it was understood they were to cut from defendant's lands; that he told Murphy that, if they could not keep within the lines, he would not enter into the agreement, because there was "nothing in it."  He also testified that, when the government officials called his attention to the fact that timber had been cut in trespass, he had several conversations with plaintiffs, told them where the trespasses complained of were alleged to have been committed, and they said they had cut the timber there.  He said: "I told them this would have to be paid for, and I told them I was in a position where I had no option in the matter.  I told them I must pay, as having received this property without having knowledge of

its having been taken from government lands. They did not have very much to say about it. They did not object— they said they supposed it had to be paid for. \* \* \* A portion of this material that the government alleged had been cut in trespass was yet in the timber and had not been delivered. \* \* \* They asked me to see Mr. Conkling, who had control of the forest operations, and see if he wouldn't let them deliver the balance of the timber so that they could get the benefit of the hauling. This I did, and Mr. Conkling said it was all right for them to go and deliver the timber on the flume. We said we would charge them whatever we had to pay the government, less the hauling. This agreement seemed to be satisfactory to them. We have paid the government the amounts claimed by it for those different trespasses. \* \* \* I made a memorandum at the time of the contract with Murphy, as follows:

" 'Bozeman, Sept. 24, 1906.

" 'Made contract with Murphy & Ryan to-day to make and deliver on my flume all railroad ties that can be made from timber found on my land, situated in sections 16, 17, 20 & 28, as shown by blue-print of same in 3 S. 7 E. Bear Canyon, for which I agree to pay 30c each for No. 1 ties and 18c for No. 2 ties; for lath timber made from tops 6½c per stick, for sticks 4½ in. to 8 in. in diameter at top and 8 ft. long, delivered on flume, and received and inspected from time to time as delivered.

" 'Agreement with Jack Murphy.

" 'WALTER COOPER.'

"Says no ties on 17."

George Bramble testified: "Murphy said to me, 'We got over the lines—cut timber over the lines.' I says, 'Aren't you afraid to go in there and making trouble of it?' He says, 'No, it will only cause the old man (meaning Cooper) to pay stumpage.' I says, 'The timber isn't very good, is it?' He says, 'Yes, the timber is fine.' " Murphy denied having such conversation.

J. W. Freeman, United States district attorney, testified that he had compelled Cooper to pay for the timber cut in trespass.

H. W. Trask testified that he was bookkeeper and confidential man for Mr. Cooper. He said: "I had charge of the business in Bear Canyon. I was able to go once or twice a month and look over the various work personally. I had been assured at all times by both Murphy and Ryan that they knew where Mr. Cooper's lines were and had run them. * * * They had given me to understand that they had better knowledge than anybody else. The question of the locality of their cutting with reference to their general work was discussed frequently. * * * I have had conversations with them as to what timber was comprehended under the contract, to the effect that they were to cut strictly within the lines of Mr. Cooper's lines, * * * and I have asked both Murphy and Ryan as to whether or not they were cutting within Mr. Cooper's lines, and they both assured me they were. They had a blue-print or map of Mr. Cooper's lands and also a standard make of surveyor's compass. I saw one of their men making ties off of Mr. Cooper's land, and they told me they would move him off right away. Neither of the plaintiffs at any time made any objection to a settlement of those trespasses; nor did they at any time make any dispute or deny their commission of the trespasses."

David T. Conkling testified: "I am in charge of the Gallatin Forest. I had a conversation with Ryan, and he told me they cut so much stuff from government land because they were looking for the best timber they could find. In the conversation that I had with them neither of the plaintiffs ever made any denial of the fact that they had committed these trespasses, * * * although I never had a positive admission from them that they did the cutting. It was a generally understood fact, and no denials were made by them. * * * I asked Murphy if he was furnished a blue-print, and he told me he had one. * * * The lines referred to were imaginary lines and were hard to find."

John T. Murphy, one of the plaintiffs, gave the following version of what took place between himself and Mr. Cooper at the time the contract was made: "I told Mr. Cooper I had been up in Bear Canyon, what I saw, and we discussed prices, and finally he told me to go ahead and go to work in that country, and he also promised me the timber on section 21. I insisted on that timber, and he agreed to keep it for me, because there was timber on that section handy to the flume. We were to cut in cull timber. * * * No memorandum was made by Mr. Cooper or anybody at that time. I didn't tell him we were familiar with his lands. I told him I knew where I had been working for five years up to that date. I had worked there for him before on this same cull timber, except in section 28. I wasn't familiar with the lines with reference to this cull timber. He didn't furnish me with any blue-print or compass at that time. There was a blue-print left with my wife at camp, but I didn't know when it was left there. Mr. Cooper didn't tell me that if we couldn't cut within the lines he didn't want us to cut at all. There were no lines up there blazed out that we could go by. We never admitted to Mr. Cooper that he could charge any sum against us for any alleged trespass. I never at any time consented that those charges be made against me and Mr. Ryan. The first time I came to town I told Mr. Cooper I didn't think I ought to pay a cent and didn't know I had to pay. * * * It was agreed we were to cut on 28, also on 21. As to whether it was my understanding that our cutting was to be confined to 21 and 28, I will say it was to be there and in other places where we could find timber. He wanted us to clean 21 and 28 up that winter, and afterward other places we could find timber. We could work and clean that upper country up that winter. Q. And so the agreement was that you could work wherever you found timber, and the agreement was that you could cut on 21 and 28 and other places after you finished that? A. No, we were to cut— Q. What did he say with reference to that, with regard to other timber? A. There was no contract at all. Q. So the contract was simply to cut timber on 21 and

27 [28] ?   A. Those were the places mentioned.   Q. And that was the extent of the contract, was it?   A. We had men work-- ing at the time, and he didn't say what to do with them, and. I told him we would move them up as soon as we could.   Q. You: had a contract on September 24, 1906?   A. Yes, sir.   Q. What, was said at that time? . A. Nothing, only I was to get the price for ties.   Q. I am asking you as to the place.   Was there any agreement that you were to cut elsewhere than on sections 21 and 28, at that time?   A. I don't know as there was.   Q. Will: you say there was not?   A. No, I won't say.   I won't say that I remember whether there was or not.   Q. You remember the agreement you had at that time?   A. I know the prices. Q.   Was that all you were concerned in?   A. I know I was to work on 28, and I was to have 21.   Q. I am asking you as to the agreement.   A. I told Mr. Cooper unless I could have this timber on 21 I didn't want any.   Q. We have disposed of 21. You said the contract was you were to cut on 21 and 28.. A. And I was to build a camp on 28.   Q. So far as you can recall, there was no other agreement with reference to cutting timber besides on sections 21 and 28 at that time?   A. There may have been.   Q. You say there was or was not?   A. I don't, say either way.   Q. You have no recollection of anything of that kind?   A. Not positive.   That is all I can tell with refer-- ence to the contract at that time as to the places where the tim-- ber was to be cut.   *  *  *   I don't remember anything said by him about cutting within the lines at that time.   *  *  * He didn't tell me he had had previous trouble with trespass. matters.   I believe he also said he wanted us to be careful and: keep within the lines.   *  *  *   Nothing was said with refer-- ence to our keeping in the lines, but I think he said he had had trouble on the West Gallatin.   As to whether he warned me to, keep within the lines and avoid trespass, I will say that I told him that I knew the lines.   I knew where the lines were on one corner.   I supposed I knew where the ground was, but not where the lines were.   As to how I knew where the lines were, I will: say that it was because I worked for him on the same ground.

for four or five years.  I kept within the lines of the slashings. I didn't go beyond where other people were working, and that was the theory I was going on with Mr. Trask and Mr. Cooper, and on 28 my knowledge of Mr. Cooper's lands I had none, and in that proposition to Mr. Cooper or Mr. Trask I had none until after the survey made by Mr. Robertson.  I never said to Mr. Cooper or Mr. Trask that I knew where the lines were. * * * I think it is true that these trespasses that were testified to by Mr. Trask, Mr. Cooper, Mr. Conkling, and Mr. Hayes were the lands our men cut upon.  It is not a fact that I stated to Mr. Conkling that we cut beyond Mr. Cooper's lines and on government land because we wanted good timber.  * * * I had every reason to think that the ground belonged to Mr. Cooper, and I told Mr. Trask so, and that I wasn't going to stand for it.  * * * All of the ties cut in trespass were cut by us and our men mostly, and the tie cutting that was done on sections 16, 17, 20, 21, and 28, after the contract was entered into, was done by us and our men, with the exception of some mine ties Mr. Trask had made.''

J. W. Ryan, one of the plaintiffs, testified: ''The reason we cut on government land was that there was no way of telling where we were working.  They were supposed to be their lands. We never found any lines there to show us.  * * * A blueprint came in there, I guess it was shortly prior to the time this contract was made.''  In answer to the question, ''Did you commit these trespasses on the ground in question?'' he answered, ''We done this cutting alleged to have been in trespass which was charged against Mr. Cooper, except a small portion of it.''

We think it altogether unreasonable to suppose, in view of the foregoing testimony, that the jury could have found that the timber cut in trespass, for which Cooper was obliged to pay, was not cut by plaintiffs and their men.  Both plaintiffs virtually confessed that the greater portion of it was cut by them. So that, in order to arrive at the conclusion that they were entitled to a verdict for the full amount of their claim, the jury

must have found that they did not undertake to cut within the lines of Cooper's lands, as known to them. Cooper testified positively that Murphy did so agree. Bramble said that Murphy spoke of getting over the lines. Trask's evidence was to the effect that both of the plaintiffs told him that, by the terms of the contract, they were to cut strictly within Mr. Cooper's lines; and Conkling testified that Ryan said that they cut so much stuff from government lands because they were looking for the best timber they could find. We may assume that this testimony is all contradicted. The question for decision is, however: What were the terms of the contract between Cooper and Murphy? We have Cooper's version. . No third person was present. What does Murphy say about it? If there is a substantial conflict in the testimony of these two parties, the verdict of the jury must remain undisturbed. Let us first look to the allegations of the verified replication. We find it there alleged that "the said timber [was] to be cut from such lands as should be designated from time to time by the defendant." And again: "These plaintiffs allege that according to their said agreement such ties and timber were to be cut by plaintiffs on lands designated by the defendant, but no particular sections or lands were designated or described by the defendant at the time said agreement was entered into, but it was understood and agreed that the defendant was to survey and designate on the grounds the lands from which said timber was to be cut from time to time as the plaintiffs were ready to cut the same, and all of said timber so cut by the plaintiffs was to be received and inspected from time to time as delivered on said flume, and these plaintiffs deny that the agreement was otherwise than above stated by them." And again: "Plaintiffs allege that if they ever cut any timber of any kind or description from any government lands, that they were not at fault in so doing, and that the same was cut by them because such timber was designated by the defendant to be so cut by them." There is no testimony whatsoever to substantiate these allegations. Murphy's narration of the transaction contains no intimation that Cooper agreed to designate the lands

41 Mont.—6

from time to time during the progress of cutting. The record discloses the fact that Cooper owned lands in sections 21 and 28. Murphy's testimony seems to indicate an anxiety to be allowed to cut on section 21, and he says it was finally agreed that they should cut on sections 21 and 28. We have no doubt that, if the contract contained no other provisions, it should be interpreted as confining the plaintiffs' operations to these two sections of land. But Murphy testified that, according to the terms of the contract, they were to cut on sections 21 and 28 "and in other places where we could find timber." It then became very material to ascertain where, according to the contract, those other places were. He testified that they were not to work wherever they found timber, after they finished cutting sections 21 and 28. And this testimony was followed by his declaration that there was "no contract at all" with regard to other timber, and that the places mentioned were sections 21 and 28. Finally, in answer to the direct inquiry as to what was said at the time the contract was made, he said, "Nothing, only I was to get the price for ties," and he finished his testimony on this branch of the case by stating that he did not know "as there was any agreement" that they were to cut elsewhere than on sections 21 and 28; that he did not remember whether there was or not; that there may have been some other agreement with reference to cutting elsewhere; that he would not say either way; and that he had no positive recollection of anything of that kind. Thereupon he limited the terms of the contract strictly to sections 21 and 28, by saying that he could tell nothing more with reference to the places where the timber was to be cut.

Viewing this testimony in its most favorable light, and bearing in mind that the burden of proof rested upon the defendant, it not only fails to prove the affirmative allegations of the replication, but in our judgment substantially corroborates the testimony of the defendant himself. The latter's motion for a directed verdict should have been sustained.

We recognize the difficulty of the plaintiff Murphy's position. It appears that he was unable to substantiate the allegations of

his replication, quoted above, and he was therefore left in a situation where he must either confess that he was to cut within the lines of the defendant's lands, or that he agreed to cut timber belonging to the government of the United States. It seems unnecessary to comment upon the apparent contradictions in other parts of his testimony. Neither is it necessary, as it seems to us, to discuss other specifications of error found in the brief of counsel.

In deciding this appeal we have confined ourselves strictly to the case presented to this court. This we believe to be the proper course for an appellate court to pursue. It is not to be understood, however, that the decision establishes the precedent that the correct theory of the relative rights and obligations of the parties was adopted in the court below. We have not considered that question.

The judgment of the district court and the order denying a new trial are reversed, and the cause is remanded for further proceedings.

*Reversed and remanded.*

Mr. Chief Justice Brantly and Mr. Justice Holloway concur.

## On Motion for Rehearing.

(Submitted April 28, 1910. Decided April 30, 1910.)

MR. JUSTICE SMITH delivered the opinion of the court.

Respondents' counsel claim that the court overlooked the question whether the appellant's counterclaim states facts sufficient to constitute a cause of action. In view of what is said in the last paragraph of the foregoing opinion, we do not think the learned counsel can consistently claim that it was the court which overlooked the question. We do not decide that the counterclaim is insufficient. It is too late to raise that question for the first time on motion for a rehearing.

*Rehearing denied.*

Mr. Chief Justice Brantly and Mr. Justice Holloway concur.